## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| ORION EDDLEMON, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-01264-MMM-JEH |
| v. | ) ) | Hon. Michael M. Mihm |
| | ) | Hon. Mag. Jonathan E. Hawley |
| BRADLEY UNIVERSITY, an Illinois not-for-profit corporation, | ) ) | |
| Defendant. | ) ) | |

### DEFENDANT BRADLEY UNIVERSITY'S
### MOTION FOR SUMMARY JUDGMENT

Defendant Bradley University (the "University"), pursuant to Federal Rule of Civil Procedure 56 and Central District of Illinois Local Rule 7.1(D), respectfully moves this Court for summary judgment in the University's favor on each claim asserted in the Second Amended Complaint ("SAC") filed by Plaintiff Orion Eddlemon ("Plaintiff").[1] In support of its motion, the University states:

### INTRODUCTION

This action arises out of the University's transition to remote learning in the Spring 2020 semester—a measure dictated by the COVID-19 global pandemic and stay-at-home orders issued by the Governor of Illinois. Plaintiff, a student enrolled in the University at this time, does not dispute that the University's actions were necessary but nevertheless asserts the University breached an alleged promise to deliver fifteen weeks of in-person instruction when it extended spring break by one week to prepare for the transition to remote learning. He further asserts the

---

[1] In conjunction with this motion, the University has also filed a motion to request oral argument and a motion for leave to file exhibits in support of this motion under seal pursuant to the parties' protective order.

University breached alleged promises to provide on-campus activities and lab instruction in exchange for his activity fee and course surcharge fee payments. Alternatively, Plaintiff alleges the University was unjustly enriched to Plaintiff's detriment and failed to utilize federal assistance for the benefit of students. Plaintiff seeks a partial refund of his tuition, activity fee, and course surcharge fees for the Spring 2020 semester.[2]

Discovery has concluded, and Plaintiff has failed to adduce any evidence to support his theories. To the contrary, the undisputed record conclusively disproves both claims. The breach of contract claim is predicated on contractual terms that do not exist, were not breached, and asserts damages Plaintiff did not incur. The unjust enrichment claim is incompatible with the parties' contractual relationship, is not a separate cause of action under Illinois law, and is based on supposed unjust conduct that never occurred. There is thus no genuine dispute as to any material fact, and the University is entitled to judgment as a matter of law.

First, Plaintiff is suing on alleged contractual terms that do not exist. Although the relationship between Plaintiff and the University is contractual, it is Plaintiff's burden to establish the terms of that contract are what he claims them to be – that is, a promise for fifteen weeks of in-person instruction, on-campus activities, and on-campus lab instruction. To meet this burden, Plaintiff must present evidence of definite and certain promises. He has not done so. To the contrary, the alleged contractual sources to which Plaintiff points belie each of his asserted terms.

Second, Plaintiff has failed to present any evidence of a breach. To the extent Plaintiff's

---

[2] Plaintiff has also filed a Motion for Class Certification seeking to certify multiple putative classes of students. *See* Dkt. 41. The University denies that Plaintiff has met his burden of proof on class certification and will oppose Plaintiff's motion separately in accordance with this Court's scheduling orders. *See* Text Order (Nov. 17, 2021); Text Order (Feb. 9, 2022). Regardless, if the Court enters summary judgment, Plaintiff's Motion for Class Certification should be denied as moot because Plaintiff cannot serve as a class representative if he lacks an individual claim. *See Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1001 (7th Cir. 1994) (affirming denial of motion for class certification as moot following entry of summary judgment for defendant because plaintiff "cannot represent a class" where he has "no individual cause of action").

contract with the University included any promise with respect to the academic calendar, the University revised its academic calendar in accordance with the parties' express agreement. Likewise, it is undisputed that the University utilized activity fees and course surcharge fees in accordance with its written guidelines, past practices, and all the alleged contractual sources on which Plaintiff relies.

Third, Plaintiff cannot establish contractual damages. Plaintiff's own testimony confirms the value of his education was not predicated on the number of hours of instruction time he received—and in fact, he received more total instruction time in the Spring 2020 semester, despite the extended spring break, than the preceding semester. Plaintiff received the benefit of his bargain because the University continued to provide Plaintiff with an uninterrupted undergraduate education and enabled him to continue to earn college credits and to progress towards his goal of attending medical school. As for fees, the University continued to offer events and resources to students throughout the Spring 2020 semester and otherwise expended fees in a manner consistent with its policies and past practice. Plaintiff's unilateral decision not to take advantage of the benefits offered does not constitute an injury.

Fourth, Plaintiff cannot maintain an unjust enrichment claim where a contract governs the parties' dispute. There is no question the parties' relationship is contractual; it is the contractual terms and alleged breach that are disputed. An unjust enrichment claim cannot proceed on these facts.

Fifth, unjust enrichment is not an independent cause of action in Illinois, and Plaintiff has not alleged or otherwise established facts separate and apart from the University's conduct that forms the basis of Plaintiff's breach of contract claim.

Sixth, Plaintiff cannot establish the necessary elements of unjust enrichment because there

is no evidence that the University received an unjust benefit to Plaintiff's detriment or failed to dedicate the entirety of its federal aid for the benefit of students.

For each of these reasons, this Court should enter summary judgment for the University.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.     The University's Academic Calendar**

1.      The University is a private higher education institution in Peoria, Illinois. SAC ¶ 9.

2.      The University provides educational instruction on a semester basis, with the projected academic calendar for each semester set out in its course catalog (the "Course Catalog"). SAC at Ex. 1, p. 16-21.

3.      The Course Catalog contains a section titled "Academic Calendar (On Campus)," which states at the very outset: "The academic calendars *are subject to revision*. Students should refer to the most recent Schedule of Classes ([http://www.bradley.edu/classes/](http://www.bradley.edu/classes/)) for important dates each semester." SAC at Ex. 1, p. 16 (emphasis added); Ex. 1, O. Eddlemon Dep. 131:7-17 (Dec. 29, 2021). *See also* Ex. 2, Univ. Interrog. Resps. 2-3 (Mar. 31, 2021) (noting Course Catalog "is a contract with respect to the specific terms and conditions set forth therein").

4.      The Academic Calendar lists the Spring 2020 semester as scheduled to start on January 22, with spring break spanning from March 14 – March 22, and final exams ending on May 13. SAC at Ex. 1, pp. 16-17.

5.      Plaintiff could not identify any terms in the Course Catalog that specifically promised fifteen weeks of instruction during the Spring 2020 semester, and there is no such term. Ex. 1, Eddlemon Dep. at 136:22-137:2; *see generally* SAC at Ex. 1.

6.      Full-time students are considered those who take twelve to sixteen credits. Ex. 1, Eddlemon Dep. at 50:23-51:5. All full-time students taking credits within this range are charged the same amount of tuition, despite the difference in credit hours. Ex. 1, Eddlemon Dep. at 51:6-

4

11. For Spring 2020, tuition for full-time students was $17,100.00. SAC at Ex. 1, p. 33.

7.      In addition to the Course Catalog, Plaintiff also states he would consider course syllabi to be part of his agreement with the University. Ex. 1, Eddlemon Dep. at 129:14-130:3. Plaintiff acknowledges he did not receive syllabi for any of his courses before the first day of class, after he had already registered. Ex. 1, Eddlemon Dep. at 130:7-13. Syllabi were not otherwise available to students when registering for classes and thus could not be considered in deciding whether and for which classes to register. Ex. 1, Eddlemon Dep. at 130:7-13; 154:23-155:9.

8.      Though Plaintiff claims the Spring 2020 syllabi included the number of weeks for the course and thus promised fifteen weeks of instruction, Ex. 1, Eddlemon Dep. at 136:22-137:14, Plaintiff produced only two syllabi for the Spring 2020 semester, neither of which incorporates a fifteen-week instruction schedule. Ex. 3, SUPPORION0009-12 (noting "tentative" exam schedule); Ex. 4, SUPPORION0025-29 (containing no schedule in any form). Syllabi outside of the Spring 2020 semester also confirm that the course schedules are expectations, as opposed to guarantees. *See* Ex. 5, SUPPORION0015 – 17 (noting schedule is subject to change); Ex. 6, SUPPORION0018 – 24 (noting "tentative" schedule); *see* Ex. 7, K. Angeletti Affidavit ¶ 2(e – h). Plaintiff also acknowledges that professors have discretion to cancel classes, regardless of the schedule set forth in the syllabus. Ex. 1, Eddlemon Dep. at 116:8-117:11.

## II.    Activity Fees

9.      In addition to tuition, the University charged an activity fee of $85.00 for the Spring 2020 semester to all undergraduate students with nine credit hours or more. SAC at Ex. 1, p. 33; Ex. 8, D. Koch Affidavit ¶ 2. The Course Catalog refers to the activity fee only to provide the amount and to encourage students to consider the cost of the activity fee in determining their total semester payment. *See* SAC at Ex. 1, p. 33, 35, 37. The Course Catalog contains no additional terms or promises regarding the activity fee, how it will be spent, or what activities it covers. *See*

5

*generally* SAC at Ex. 1.

10.     The Student Activities Budget Review Committee (the "SABRC"), a student-run committee, SAC at Ex. 2, p. 2, is responsible for deciding how to utilize the activity fees. SAC at Ex. 2, p. 1. A set of guidelines (the "SABRC Articles" or the "Articles") governs how the SABRC performs this job. Plaintiff alleges the SABRC Articles are part of the terms of his contract with the University, *see* SAC at ¶ 56, though Plaintiff never saw the Articles and was not otherwise aware of them before he become involved in this lawsuit. Ex. 1, Eddlemon Dep. at 31:7-13; Ex. 9, Eddlemon Interrog. Resps. 3 (Dec. 21, 2021).

11.     The SABRC Articles describe how activity fees are to be allocated and spent, including a section on "Goals" that the SABRC aims to meet. SAC at Ex. 2, pp. 1, 4. The "Goals" include to "provide the funds for campus-wide events sponsored by student organizations" and to "strive for student activities which provide education . . ., entertainment . . . and/or service to the campus[.]" SAC at Ex. 2, p. 1. The SABRC Articles also state that "[a]ll programs and costs funded through student activity fees should pay for programs that benefit the student body as a whole." SAC at Ex. 2, p. 12. None of the Goals listed, nor any other portion of the Articles, promise (or even reference) in-person activities for the entirety of the semester or for each week of the semester. *See generally* SAC at Ex. 2.

12.     The SABRC Articles do not require that activity fees be completely exhausted by the end of the semester in which they were paid. *See generally* SAC at Ex. 2. In fact, the Articles expressly contemplate that extra funds allocated to certain activities, namely the Special Events Reserve Fund ("SERF"), will roll over: "If a balance exists at the end of the school year, that amount will be applied to the following year's account." SAC at Ex. 2, p. 14; Ex. 10, N. Thomas Dep. 14:17-25 (May 5, 2021); Ex. 8, Koch Affidavit at ¶ 3.

13.     There have been several semesters and years in the past in which the activity fees were not fully exhausted at the end of the semester or school year. Ex. 10, Thomas Dep. at 13:23-14:5; Ex. 11, Bradley 002332 (noting balance for club sports funding); Ex. 12, Bradley 002333 (noting balance for Fall 2019 semester); Ex. 13, Bradley 002336 (noting balance for Spring 2020 semester); *see* Ex. 8, Koch Affidavit at ¶ 8(e – f), (h). Plaintiff is not seeking an activity fee refund for any semester outside of Spring 2020.

## III.     Course Surcharge Fees

14.     Certain courses also include a course surcharge fee on top of tuition, the amount of which varies depending on the course. SAC at ¶ 53 (noting Plaintiff paid different course surcharge fees for two separate classes). The Course Catalog encourages students to consider the cost of course surcharge fees in determining their total semester payments but otherwise contains no additional references to course surcharge fees and includes no terms or promises with respect to how the fees are to be spent. SAC at Ex. 1, p. 35.

15.     The course descriptions for classes that impose course surcharge fees do not even reference the course surcharge fees, let alone contain any terms or promises as to how the fees are to be spent. *Compare* SAC at ¶ 53 (noting Plaintiff enrolled in BIO 250 and BIO 484, which both had course surcharge fees), *with* SAC at Ex. 1, p. 759 (providing description of BIO 250 and lacking reference to surcharge fee), 768 (providing description of BIO 484 and lacking reference to surcharge fee).

16.     The University's historical practice has been to collect and apply course surcharge fees for the maintenance and replacement of expensive equipment, laboratory infrastructure, specialized computers and related software, increasing technology needs, and certain expenditures that are outside the scope of regular college operating funds. Ex. 8, Koch Affidavit at ¶ 5. Course surcharge fees need not be fully expended in any given semester for which they are charged but

instead may be accumulated to replace expensive equipment in future semesters. Ex. 8, Koch Affidavit at ¶ 6. Course surcharge fees are not allocated to expenditures on specific students, specific in-person course activities during the academic semester, or student access to specific equipment or materials on campus.

## IV.    The Mandatory Interruption of the Spring 2020 Semester Due to COVID-19

17.    In response to the COVID-19 global pandemic, Illinois Governor J.B. Pritzker declared Illinois a disaster area during, and extending through, the Spring 2020 semester. Ex. 14, Fourth Gov. Disaster Procl.;[3] Ex. 15, Exec. Order No. 30. Governor Pritzker issued executive orders throughout March to protect the public health. Ex. 16, Exec. Order No. 2; Ex. 17, Exec. Order No. 5.

18.    On March 20, 2020, as COVID-19 continued to rapidly spread across the State, Governor Pritzker entered a stay-at-home order, closing all but essential businesses and prohibiting all gatherings outside a single household. Ex. 18, Exec. Order No. 8; Ex. 15, Exec. Order No. 30 (extending stay-at-home order). Colleges and universities were required to close all on-campus operations and were permitted to remain open only to facilitate distance learning, perform research, and conduct limited essential functions. Ex. 18, Exec. Order No. 8 at § 12(j).

19.    As a result of the pandemic and the Governor's orders, the University was forced to adapt to these unanticipated circumstances by extending spring break for an extra week in order to facilitate the transition to remote learning. SAC at ¶ 62; Ex. 19, Bradley 001573; *see* Ex. 8, Koch Affidavit at ¶ 8(a). The Department of Education and the University's accrediting body

---

[3] This Court may take judicial notice of the Governor's executive orders. *See Hill v. SEIU*, No. 15 CV 10175, 2016 U.S. Dist. LEXIS 62734, at *3 (N.D. Ill. May 12, 2016) ("Matters of public record—for example, statutes, regulations, and executive orders—are subject to judicial notice and may be considered even if not mentioned in the complaint.") (citing *e.g.*, *White v. Keely*, 814 F.3d 883, 886 n. 2 (7th Cir. 2016)).

approved the University's decision to extend spring break without rescheduling classes to allow the University time to adjust to the mandatory campus closure. Ex. 20, J. Skaggs Dep. 10:24-12:3 (May 18, 2021).

20.    The University's adjustment to the academic calendar did not affect students' ability to receive academic credit for their courses in the Spring 2020 semester; the University still provided the requisite amount of instruction time per credit hour to achieve course objectives and to provide full academic credit. Ex. 20, Skaggs Dep. at 10:3-12:3.

21.    This is not the first time the University has had to cancel classes without rescheduling them, which has occurred several times before in connection with severe weather or in response to traumatic events. Ex. 10, Thomas Dep. at 20:3-21:3; Ex. 21, D. Koch Dep. 16:14-22 (May 21, 2021).

22.    The University informed the student body that the campus would be closed and all classroom instruction would be conducted remotely for the remainder of the semester. SAC at ¶ 62; Ex. 19, Bradley 001573; Ex. 2, Univ. Interrog. Resps. at 8 (noting University required to close campus in response to Governor's orders); *see* Ex. 8, Koch Affidavit at ¶ 8(a).

23.    Following the transition, the University continued to offer educational instruction to allow students to complete the Spring 2020 semester. Ex. 1, Eddlemon Dep. at 78:14-16. The University also continued to offer activities, events, and resources for students to access virtually. Ex. 22, Bradley 002335; Ex. 23, Bradley 002162 – 2164; Ex. 24, SUPPORION0155 – 157; Ex. 25, SUPPORION0235 – 260; *see* Ex. 8, Koch Affidavit at ¶ 8(d), (g); *see* Ex. 7, Angeletti Affidavit at ¶ 2(i – j). The University also continued to utilize course surcharge fees consistent with their historical use on equipment maintenance and technology upgrades. Ex. 8, Koch Affidavit at ¶ 7. Consequently, the University decided that no tuition or fee refunds were warranted for the Spring

2020 semester. SAC at ¶ 75; Ex. 26, Bradley 001603 – 1605; *see* Ex. 8, Koch Affidavit at ¶ 8(b).

**V.     The University's Receipt and Use of Federal Assistance to Benefit Students and Continued Expenditure of University Resources to Help Students and Employees**

24.     In response to the pandemic, the federal government provided universities with relief funds under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") – Higher Education Emergency Relief Fund ("HEERF"). Ex. 2, Univ. Interrog. Resps. at 6. The University used all CARES Act funding it received exclusively for student refunds and COVID relief-related payments to students. Ex. 2, Univ. Interrog. Resps. at 6; Ex. 8, Koch Dep. at 6:17-12:3 (explaining how CARES Act funds were distributed to students). The University did not receive any other state or federal relief funding. Ex. 2, Univ. Interrog. Resps. at 6.

25.     In addition to housing and meal plan refunds provided to students displaced from student housing, the University also incurred additional costs in its mandatory campus closure and transition to remote learning. Ex. 21, Koch Dep. at 12:4-9. The University continued to pay student employees based on their normal working hours, despite the fact that the students were no longer working. Ex. 21, Koch Dep. at 12:10-23. The University also continued to pay its regular employees who were no longer able to work on campus because of the Governor's orders. Ex. 21, Koch Dep. at 13:1-5. Aside from payroll expenses, the University also incurred expenses related to technology and supplies necessary to facilitate the transition to remote learning, including providing laptops for students to access their classes remotely. Ex. 21, Koch Dep. at 12:24-13:1; Ex. 20, Skaggs Dep. at 14:7-15:13, 15:23-16:4.

**VI.    Plaintiff's Experience at the University**

**A.     Plaintiff's Courses and Tuition Payments**

26.     Plaintiff transferred to the University in the Spring 2019 semester and enrolled in fourteen credit hours, at a tuition rate of $18,280.00 under the University's standard full-time rate

for that semester. Ex. 1, Eddlemon Dep. at 50:9-22; Ex. 27, SUPPORION0335 – 336; Ex. 28, SUPPORION0337; *see* Ex. 7, Angeletti Affidavit at ¶ 2(k – l). Plaintiff occasionally missed class during this semester. Ex. 1, Eddlemon Dep. at 53:23-54:3.

27.     For the Fall 2019 semester, Plaintiff was enrolled in fifteen credit hours, at a tuition rate of $17,100.00 under the University's standard full-time rate for that semester. Ex. 29, ORION0001; Ex. 30, ORION0009; *see* Ex. 7, Angeletti Affidavit at ¶ 2(a), (c). Based on his Fall 2019 course schedule, Plaintiff received approximately 12.75 hours of instruction per week for these fifteen credit hours. Ex. 1, Eddlemon Dep. at 59:22-61:15.

28.     For the Spring 2020 semester, Plaintiff was enrolled in fifteen credit hours, at the same tuition rate as his Fall 2019 tuition under the University's standard full-time rate. Ex. 31, ORION0002; Ex. 32, ORION0010 – 11; *see* Ex. 7, Angeletti Affidavit at ¶ 2(b), (d).

29.     Based on his Spring 2020 semester, Plaintiff was initially scheduled to receive approximately 16 hours of instruction per week for these fifteen credit hours. Ex. 1, Eddlemon Dep. at 68:6-70:2. Even with the extended spring break, Plaintiff still received approximately 30 more hours of instruction in Spring 2020 than his Fall 2019 schedule for the same number of credit hours and cost of tuition. *Compare* Ex. 1, Eddlemon Dep. at 59:22-61:15 (discussing minutes of instruction in Fall 2019 based on a fifteen-week schedule), *with* Ex. 1, Eddlemon Dep. at 68:6-70:2 (discussing minutes of instruction in Spring 2020 based on a fourteen-week schedule).[4]

30.     While the University informed students that it intended to conduct in-person instruction for the Fall 2020 semester, it also informed them that, due to the changing nature of the pandemic, the campus may once again need to transition to completely remote instruction. Ex. 1,

---

[4] Plaintiff received approximately 765 minutes of instruction per week for the Fall 2019 semester, for a total of 191.25 instruction hours for the Fall 2019 semester. Plaintiff received approximately 960 minutes of instruction per week for the Spring 2020 semester, for a total of 224 instruction hours for the Spring 2020 semester (accounting for the extending spring break).

Eddlemon Dep. at 93:21-94:12, 95:17-97:5; Ex. 33, Bradley 001682 – 1683; *see* Ex. 8, Koch Affidavit at ¶ 8(c). Despite being aware of both this possibility and that the tuition rate would remain the same, Plaintiff decided to reenroll for the Fall 2020 semester. Ex. 1, Eddlemon Dep. at 95:2-11.

31.     Plaintiff was allowed to choose between in-person and remote learning for certain classes during the Fall 2020 semester. Ex. 1, Eddlemon Dep. at 100:10-14. He expressly chose to register for two classes, neither of which was specifically required for his major or for graduation, that he knew would be conducted online.[5] Ex. 1, Eddlemon Dep. at 104:8-105:6 (noting Immunology was an elective and Astronomy not connected to a course requirement). Plaintiff's main consideration in re-enrolling was to avoid a gap in his education or a second transfer, as he believed these factors would impact his ability to get into medical school. Ex. 1, Eddlemon Dep. at 76:2-14; 94:13-95:1; 119:13-21; 120:10-13.

32.     Despite the fact that classes could be available using any method of instruction (in-person, online, or hybrid), Plaintiff again registered for classes for the Spring 2021 semester, which was his final semester at the University before graduating. Ex. 1, Eddlemon Dep. at 119:13-120:9.

33.     Outside of the extended spring break in Spring 2020, Plaintiff has had other classes cancel without receiving any official makeup class. Ex. 1, Eddlemon Dep. at 72:18-73:1, 109:14-22, 111:3-21, 112:8-20, 113:8-114:2, 114:16-115:2, 126:15-127:4; 164:16-165:1. In fact, during the Fall 2020 semester, one class was cancelled for a full week. Ex. 1, Eddlemon Dep. at 113:22-114:2. Plaintiff acknowledges that cancelling class is within the professor's discretion. Ex. 1, Eddlemon Dep. at 116:8-117:11. He is not seeking recovery for cancelled classes outside of the Spring 2020 semester. Ex. 1, Eddlemon Dep. at 114:3-8, 114:24-115:5.

---

[5] Plaintiff's Astronomy course was entirely online, and his Immunology course was online instruction and in-person labs. Ex. 1, Eddlemon Dep. at 101:1-6.

**B.      Plaintiff's Student Involvement and Activity Payments**

34.      From the Spring 2019 semester through the Spring 2020 semester, Plaintiff belonged to the student organization Alpha Epsilon Delta ("AED"). Ex. 1, Eddlemon Dep. at 52:1-6, 62:12-19, 71:24-4. Both before and after the transition to remote learning, AED held weekly meetings (in-person and then remote), which Plaintiff attended. Ex. 1, Eddlemon Dep. at 33:9-19, 72:5-7, 88:1-15. Plaintiff did not belong to any other student clubs or organizations at the University but attended a few meetings for the Socratic Society during the Fall 2020 and Spring 2021 semesters. Ex. 1, Eddlemon Dep. at 108:2-13, 128:1-3.

35.      In addition to the weekly AED meetings, Plaintiff would attend various events, giveaways, or gatherings on the quad. Ex. 1, Eddlemon Dep. at 52:18-53:7, 72:8-17, 108:2-24; Ex. 9, Eddlemon Interrog. Resps. at 3-4 (noting Plaintiff did not attend all quad events). These events were offered during the Spring 2020 semester until the mandatory campus closure. Ex. 1, Eddlemon Dep. at 72:8-12. Plaintiff could not recall whether the quad events were offered during the Fall 2020 semester. Ex. 1, Eddlemon Dep. at 108:2-20. He is not seeking relief related to any COVID impact on Fall 2020 events and activities.

36.      Although Plaintiff could not recall any resources or events offered to students during the remote instruction period, Ex. 1, Eddlemon Dep. at 88:22-89:10, the University did offer such resources, events, and student involvement opportunities, and Plaintiff received emails notifying him of these opportunities. Ex. 10, Thomas Dep. at 10:14-21 (noting activity fees not refunded because fees continued to be utilized for their intended purpose); Ex. 22, Bradley 002335 (listing Spring 2020 events offered after March 23, 2020); Ex. 23, Bradley 002162 – 2164 (listing remote resources offered for students after the transition to remote learning); Ex. 24, SUPPORION0155 – 157 (calendar of events); Ex. 25, SUPPORION0235 – 260 (emails to Plaintiff

13

identifying opportunities to participate in student activities); *see* Ex. 8, Koch Affidavit at ¶ 8(d), (g); *see* Ex. 7, Angeletti Affidavit at ¶ 2(i – j).

37.      Per University policy under the Articles, unused funds in the SERF account rolled over to the next academic year for the 2020-2021 SERF account. Ex. 8, Koch Affidavit at ¶ 4.

### C.      Plaintiff's Course Surcharge Fees

38.      During the Spring 2020 semester, Plaintiff was enrolled in two classes that required a course surcharge fee. SAC at ¶ 53. Plaintiff paid a $50 fee for BIO 250 and a $150 fee for BIO 484. SAC at ¶ 53.

39.      The Course Catalog contains no terms or promises regarding how the course surcharge fees for BIO 250 and BIO 484 are to be expended. SAC at Ex. 1, pp. 759, 768. The fees were utilized consistent with their historical use on equipment maintenance and technology upgrades. Ex. 8, Koch Affidavit at ¶ 7.

40.      Plaintiff believes he is entitled to a refund of 60–70% of the course surcharge fees based on his belief that "the majority of that which [he] would have appreciated from what was paid for the course surcharge would have taken place after [he] returned to remote learning," because "the most important parts of the labs and whatnot were after . . . the return to remote learning[.]" Ex. 1, Eddlemon Dep. at 19:12-20:20.

## VII.    Procedural Posture

41.      This suit was originally filed by a different plaintiff under the pseudonym Jane Doe. Dkt. 1. After the close of discovery, Orion Eddlemon substituted in as named plaintiff and class representative for Jane Doe. Dkt. 32.

42.      In line with this Court's scheduling order entered after the substitution of the named plaintiff, the University now moves for summary judgment. *See* Text Order (Nov. 17, 2021).

## ARGUMENT

### I.    Legal Standard.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mitchell v. City of Decatur*, 528 F. Supp. 3d 904, 912 (C.D. Ill. 2021). In ruling on this motion, the court has "'one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.'" *Mitchell*, 528 F. Supp. 3d at 912 (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). To prevail, a moving party can point to either "undisputed facts supported by the record that demonstrate that it is entitled to judgment" or "an absence of evidence of an essential element of the responding party's claim[.]" *Medscript Pharm., LLC, v. D&D Pharma LTC, LLC*, 444 F. Supp. 3d 909, 913 (N.D. Ill. 2020). While the court is to construe the evidence in the light most favorable to the nonmoving party, that principle does not extend to inferences which are "supported only by speculation or conjecture." *Singer v. Raemsich*, 593 F.3d 529, 533 (7th Cir. 2010). Additionally, the court "'need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion.'" *Mitchell*, 528 F. Supp. 3d at 912 (citation omitted) (emphasis in original).

To defeat summary judgment, Plaintiff "may not rely on the allegations contained in the pleadings." *Id.* Instead, he "'must present definite, competent evidence in rebuttal.'" *Id.* (quoting *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004)). Put simply, summary judgment "is the 'put up or shut up' moment in a lawsuit, where a party must show what evidence it has that would convince a trier of fact to accept its versions of events." *Id.* (quoting *Koszla v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004)) (quotations omitted). "The existence of merely a scintilla of evidence in support of the nonmoving party's position is

insufficient" to defeat summary judgment. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (citation omitted). To survive summary judgment, Plaintiff "'must make a sufficient showing of evidence for each essential element of [his] case on which [he] bears the burden of proof at trial.'" *Mitchell*, 528 F. Supp. 3d at 912 (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Based on the undisputed material facts, Plaintiff cannot survive summary judgment.

## II. The University Is Entitled to Judgment as a Matter of Law on Plaintiff's Breach of Contract Claim.

Plaintiff lacks any evidence raising a genuine dispute of material fact and thus cannot proceed on his breach of contract claim regarding tuition, activity fees, or course surcharge fees. To establish a breach of contract claim, Plaintiff must prove: (1) the existence of valid and enforceable contract terms; (2) performance by Plaintiff; (3) a material breach by the University; and (4) a resultant injury. *Zirp-Burnham, LLC v. E. Terrell Assocs.*, 356 Ill. App. 3d 590, 600 (1st Dist. 2005). Plaintiff cannot succeed on the first, third, and fourth elements.

### A. Plaintiff Cannot Establish Valid and Enforceable Contract Terms.

The relationship between Plaintiff and the University is contractual. *See DiPerna v. Chi. Sch. of Prof'l Psych.*, 893 F.3d 1001, 1007 (7th Cir. 2018); *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992). But Plaintiff cannot establish that the terms of this contractual relationship align with his allegations. In fact, the record directly contradicts Plaintiff's allegations. To recover on his breach of contract claim, Plaintiff must "point to an *identifiable contractual promise* that the [University] failed to honor." *Ross*, 957 F.2d at 416-17 (emphasis added); *see also Bissessur v. Indiana Univ. Bd.*, 581 F.3d 599, 603-04 (7th Cir. 2009); *Fleming v. Chi. Sch. of Prof'l Psych.*, No. 15-C-9036, 2019 U.S. Dist. LEXIS 8081, *10 (N.D. Ill. Jan. 16, 2019); *Delisle v. McKendree Univ.*, No. 20-CV-1073-SMY, 2021 U.S. Dist. LEXIS 183952, *5 (S.D. Ill. Sept. 27, 2021). He

16

"must be specific about the source of [the] . . . contract, the *exact* promises the university made to the student, and the promises the student made in return." *Charleston v. Bd. of Trs. of the Univ. of Ill.*, 74 F.3d 769, 773 (7th Cir. 2013) (emphasis added); *see also Oyoque v. DePaul Univ.*, No. 20-C-3431, 520 F. Supp. 3d 1058, 1063 (N.D. Ill. 2021). Absent "definite and certain" terms, no breach of contract claim exists. *Abrams v. Ill. Coll. of Podiatric Med.*, 77 Ill. App. 3d 471, 476-77 (1st Dist. 1979). Here, Plaintiff cannot prove the existence of the terms he alleges with respect to tuition, activity fees, or course surcharge fees.

### 1. No Evidence Supports Plaintiff's Allegations of a Contractual Promise to Fifteen Weeks of Instruction or On-Campus, In-Person Instruction in Exchange for Tuition Payments.

Plaintiff initially alleged two promises in exchange for his tuition payments—a promise of "15 weeks of a Spring 2020 Semester, which was January 22, 2020 through May 13, 2020" and a promise of "on-campus" and "in-person" instruction. SAC at ¶ 39. Based on Plaintiff's Motion for Class Certification, it now appears only the alleged promise of fifteen weeks of instruction remains at issue. *See* Dkt. 41 at 5, 13, 15, 18 (indicating Plaintiff and putative class are seeking tuition refunds based solely on cancelled week of classes). Regardless, Plaintiff cannot support either promise.

Plaintiff alleges that the asserted terms are found in "catalogues, bulletins, circulars, and regulations published by Bradley, in addition to industry standards and customary dealings between students and universities." SAC at ¶ 40. Yet at the close of discovery, Plaintiff has presented no evidence of any "bulletins," "circulars," or "regulations" published by the University, nor of any "industry standards" or "customary dealings" setting forth any contractual right to fifteen weeks of instruction, or to on-campus or in-person instruction. Plaintiff's claim rests solely on the University's Course Catalog and Plaintiff's testimony regarding course syllabi. *See supra* Statement of Undisputed Material Facts ("SUMF"), at ¶¶ 3-5, 7. Neither supports his allegations.

a.      **The Course Catalog Does Not Promise Fifteen Weeks of Instruction or In-Person, On-Campus Instruction.**

Though course catalogs can express the terms of the contractual relationship between student and university, *Ross*, 957 F.2d at 416-17, Plaintiff still must prove an identifiable contractual promise within the Course Catalog. The University's Course Catalog contains no promise of fifteen weeks of instruction. Though it lists intended start and end dates for the Spring 2020 semester, the Course Catalog contains no language setting forth a definite promise of classes every week within these anticipated start and end dates. *See* SUMF at ¶¶ 3-5. Even if it had, the Academic Calendar section, which is the only portion of the Course Catalog referencing the projected dates of instruction, specifically states: "The academic calendars ***are subject to revision***. Students should refer to the most recent Schedule of Classes (http://www.bradley.edu/classes/) for important dates each semester." SUMF at ¶ 3 (emphasis added). This reservation appears plainly at the top of the Academic Calendar section. Thus, "any incipient hope of a contractual promise raised by" the Academic Calendar "is utterly dashed by the sentence" disclaiming any commitment to proceed on that exact schedule. *Border v. City of Crystal Lake*, 75 F.3d 270, 274 (7th Cir. 1996) (rejecting contractual promise in employee handbook based on disclaimer).

Plaintiff's breach of contract claim thus cannot prevail under the express language of the Course Catalog. In *Miller v. Lewis University*, 533 F. Supp. 3d 678 (N.D. Ill. 2021), the court rejected a similar claim that the university-defendant's published course schedule constituted a contractual promise of in-person learning for the duration of the semester. The court held that the claim of a contractual promise predicated on the course schedule could not stand where the course schedule expressly stated it was subject to change. *Id*. at 686-87. Other courts have likewise rejected identical or similar claims based on contractual reservations and disclaimers that precluded a promise between student and university. *See, e.g.*, *Buschauer v. Columbia Coll. Chi.*,

No. 20-C-3394, 2021 U.S. Dist. LEXIS 67157, *5, *15-16 (N.D. Ill. Apr. 6, 2021) (finding course

catalog's reservation of "right to change," *inter alia*, calendar for instruction precluded contractual

promise of fifteen weeks of instruction); *Gociman v. Loyola Univ. of Chi.*, 515 F. Supp. 3d 861,

868 (N.D. Ill. 2021) (finding reservation of "right to change" course structure and content

precluded asserted promise); *Polley v. Northwestern Univ.*, No. 20-C-4798, 2021 U.S. Dist. LEXIS

175822, *24-25 (N.D. Ill. Sept. 16, 2021) (finding "no student could interpret" course catalog as

student-plaintiffs suggested due to disclaimer); *Chong v. Northeastern Univ.*, No. 20-10844-RGS,

No. 20-10946-RGS, 2021 U.S. Dist. LEXIS 89597, *13-14 (D. Mass. May 10, 2021) (granting

summary judgment to university where catalog contained clear disclaimer preventing promises

alleged by student).

      To the extent Plaintiff is still asserting a contractual right to on-campus, in-person

instruction, that also is not sustainable on the plain language of the Course Catalog. Plaintiff cannot

point to any definite promise of in-person instruction in the Course Catalog. At most, he relies on

the listing of campus locations for classes in the Course Catalog. *See* SAC ¶ 48. As multiple courts

have already held, however, the "fact that some course descriptions may have included specific

building and room numbers does not guarantee on-campus, in-person instruction," much less the

existence of an immutable promise where on-campus instruction became impossible. *Buschauer*,

2021 U.S. Dist. LEXIS 67157, at *15-16. *See also Gociman*, 515 F. Supp. 3d at 868 (finding

parenthetical references to "in-person" lecture courses as part of course descriptions "are hardly

sufficient to form a binding contract" to deliver instruction on-campus); *Hassan v. Fordham Univ.*,

515 F. Supp. 3d 77, 88 (S.D.N.Y. 2021) (holding "informational guidance" in course catalog

"regarding, for example, a course's instructor, location, and schedule" did not constitute express

contractual promises that such details "were not subject to change" nor a relinquishment of

university's authority "to alter the modality of its course instruction"). Thus, if Plaintiff maintains

his claim for in-person instruction, the Course Catalog also does not support this theory of liability.

> **b.      Plaintiff's Course Syllabi Do Not Promise Fifteen Weeks of Instruction.**

Plaintiff proposed for the first time at his deposition that his course syllabi also supply the

promise of fifteen weeks of course instruction. SUMF at ¶ 7. But the course syllabi do not contain

such a promise. As an initial matter, Plaintiff acknowledges he did not receive his course syllabi

until *after* he registered for classes—that is, after contract formation. SUMF at ¶ 7. Thus, there is

no factual basis to construe the syllabi as part of the parties' contract. Even if Plaintiff had received

the syllabi in advance, neither of the two Spring 2020 syllabi that Plaintiff produced included a

fifteen-week instruction schedule, let alone an express promise for a specified number of classes.[6]

*See* SUMF at ¶ 8. One syllabus notes the schedule is "tentative," and the other contains no schedule

in any form. *See* SUMF at ¶ 8. In addition, Plaintiff admits professors have the discretion to cancel

classes, negating his theory that the University was required to provide him with a specific amount

of instruction time. SUMF at ¶ 8. As such, the syllabi also do not support Plaintiff's assertion that

he was promised fifteen weeks of instruction. Because Plaintiff cannot point to any evidence to

support a promise of fifteen weeks of instruction or in-person classes, Plaintiff's breach of contract

claim fails regarding his tuition claims.

> **2.      No Evidence Supports Plaintiff's Allegation of a Promise of Uninterrupted Access to On-Campus Activities for the Full Semester in Exchange for Activity Fees.**

Plaintiff has alleged he "contracted for on-campus events for the Spring 2020 semester by

paying a mandatory $85 Activity Fee." SAC at ¶ 55. He again points to the Course Catalog,

---

[6] Plaintiff produced syllabi for only two of his five classes during the Spring 2020 semester. There are no other syllabi from the Spring 2020 semester in evidence. *See* Ex. 8, Angeletti Affidavit at ¶ 3.

unspecified "circulars, bulletins, and regulations" that are not in the record, and the SABRC Articles as the sources of the alleged contractual promise of on-campus events. SAC at ¶¶ 55-57. Plaintiff also references certain "marketing" materials allegedly highlighting the "on-campus experience" at the University. SAC at ¶¶ 10-17. Because Plaintiff has offered no evidence of any "bulletins," "circulars," or "regulations" promising on-campus events, the Course Catalog, the SABRC Articles, and marketing materials as the only possible sources of the alleged promise of fifteen weeks of on-campus events. None of these sources support Plaintiff's claims.

### a. The Course Catalog Does Not Promise Unimpaired Access to On-Campus Events for a Full Semester.

The Course Catalog does not contain the activity fee promise that Plaintiff asserts. It references the activity fee only twice in its 1,054 pages, and neither reference advises what the activity fees are intended to cover, let alone promises that these fees entitle students to fifteen weeks of access to on-campus events. *See* SUMF at ¶ 9. Plaintiff's reliance on the Course Catalog in support of his activity fee breach of contract claim is thus misplaced.

### b. The SABRC Articles Do Not Promise Unimpaired Access to On-Campus Activities for a Full Semester.

Plaintiff likewise fails to identify any definite and certain promise of access to on-campus events in the SABRC Articles. Initially, Plaintiff acknowledges he never saw the Articles before this lawsuit, and thus fails to supply a basis to include the Articles in the contract. *See* SUMF at ¶ 10. Regardless, the SABRC Articles contain no promise of fifteen weeks of access to on-campus events. SUMF at ¶ 11. Likewise, there is no promise that activities would be provided on-campus. SUMF at ¶ 11. The most Plaintiff can point to are the "Goals" to "provide the funds for campus-wide events sponsored by student organizations" and to "pay for programs that benefit the student body as a whole." SUMF at ¶ 11. These statements contain no promise and set no expectation of uninterrupted access to on-campus events throughout the semester.

Even if they did, goals and aspirations are not contractual promises. *Bosch v. NorthShore Univ. Health Sys.*, 2019 IL App (1st) 190070, ¶ 70 ("We have been clear that provisions in school materials must be sufficiently definite in character to constitute a binding promise, as opposed to a general provision discussing a policy, goal, expectation, or guideline.") (citation omitted). Thus, the goals in the SABRC Articles also do not amount to enforceable promises. *See, e.g.*, *Abrams*, 77 Ill. App. 3d at 476-77; *Miller*, 533 F. Supp. 3d at 684-85 (citing *Galligan v. Adtalem Global Educ. Inc.*, No. 17-C-6310, 2019 U.S. Dist. LEXIS 17218, *7 (N.D. Ill. Feb. 4, 2019)).

### c.   The University's Marketing Materials Do Not Promise Unimpaired Access to On-Campus Activities.

Nor do the marketing materials referenced by Plaintiff contain any promise of on-campus events; the closest they come is a promotional statement that the University's "campus is always busy with fun activities." SAC at ¶ 17. "But 'promotional materials'—i.e., marketing materials or advertisements—'are not among the terms of the contract between universities and their students.'" *Miller*, 533 F. Supp. 3d at 684 (quoting *Galligan*, 2019 U.S. Dist. LEXIS 17218 at *16-17; *Diperna*, 893 F.3d at 1006-07); *see also Buschauer*, 2021 U.S. Dist. LEXIS 67157 at *14-15 (same). Thus, the University's marketing materials do not create an enforceable promise of on-campus activities throughout the Spring 2020 semester.

Because none of the materials on which Plaintiff relies for his activity fee breach of contract claim contain the terms he alleged, this theory also fails. *See Dalke v. Cent. Mich. Univ. & Bd. of Trs. of Cent. Mich. Univ.*, No. 0-000068-MK, 2020 Mich. Ct. Cl. LEXIS 3, 13 (Sept. 25, 2020) (granting summary judgment to university where documents student relied on for fee refund claim did "not meet the requirements of a contract" as they "contain[ed] no promises relative to services to be provided in exchange for the fee, what the fees would go toward, or any other material provisions found in a contract"), *aff'd Zwiker v. Lake Superior State Univ.*, No. 355128, 355377,

357275, 2022 Mich. App. LEXIS 859 (Feb. 10, 2022).

> **3.** **No Evidence Supports Plaintiff's Allegation of a Promise of Uninterrupted Access to On-Campus Lab Instruction for the Full Semester in Exchange for Course Surcharge Fees.**

Plaintiff has also alleged he "contracted for 15 weeks of access to on-campus laboratories, facilities, resources, and materials" through payment of course surcharge fees. SAC at ¶¶ 52, 60, 64, 70-71. Plaintiff bases this alleged promise on "the course descriptions" in the Course Catalog when Plaintiff registered for BIO 250 and BIO 484—the two courses for which he paid course surcharge fees. SAC at ¶ 53. Plaintiff also alleges that course surcharge fees are "[g]enerally" imposed "for courses where there is a laboratory or other hands on course components that cannot be replicated via an online course" and that the University does not charge course surcharge fees for online courses. SAC at ¶¶ 52, 60. At the close of discovery, Plaintiff has offered no evidence in support of these claims, which the University summarily denied. *See* Dkt. 40, Answer and Aff. Defs. to Plaintiff's SAC ¶¶ 52-53, 60-61 (Dec. 3, 2021).

Plaintiff again points to the Course Catalog as the sole source of the alleged promise of fifteen weeks' worth of access to "on-campus laboratories, facilities, resources, and materials" in exchange for the course surcharge fee. SAC at ¶ 52. The Course Catalog contains no such language. Indeed, it entirely omits the phrase "course surcharge." The word "surcharge" appears only four times, referring only to specific surcharges for the engineering and nursing programs (neither of which Plaintiff was enrolled in), and generally advising students to consider surcharge fees when calculating their total semester payments. SUMF at ¶ 14. The course descriptions for BIO 250 and BIO 484 contain no reference at all to the course surcharge fees, let alone any promise regarding what those fees are intended to cover or for how long. SUMF at ¶ 15.

Plaintiff also cannot point to any evidence that the course surcharge fees were promised for student-specific services or were committed to fifteen weeks of uninterrupted access to on-

campus lab instruction, facilities, resources, or materials. To the contrary, the record confirms that the fees are historically used to maintain, replace, and purchase equipment and technology—the very use to which they were put in Spring 2020. SUMF at ¶¶ 16, 23. Consequently, Plaintiff cannot present any evidence demonstrating the existence of the specific course surcharge fee terms he alleges. *See Dalke*, 2020 Mich. Ct. Cl. LEXIS at 13.

**B.      Plaintiff Cannot Prove a Breach of His Alleged Contract Terms.**

Plaintiff has also failed to establish a breach of each alleged contract term regarding tuition, activity fees, or course surcharge fees. The record demonstrates that the University honored its contractual commitments with respect to all three tuition and fee categories.

**1.      The University Properly Exercised Its Express Right to Revise the Academic Calendar.**

The Course Catalog contains an express and unqualified term permitting the University to adjust the academic calendar. SUMF at ¶ 3. In cancelling one week of classes to facilitate the mandatory transition to remote learning, the University exercised this right. Thus, even if the Course Catalog's reference to intended start and end dates for the Spring 2020 semester could be construed as a contractual promise for fifteen weeks of instruction, the same term expressly permitted the University to revise the academic calendar in the manner it did. The Department of Education and the University's accrediting body both approved the University's decision, and this adjustment did not affect students' academic credit for their coursework. SUMF at ¶¶ 19-20. The University's actions were also consistent with past practice in response to unavoidable external circumstances like severe weather or traumatic events. SUMF at ¶ 21. The exercise of a contractual right is not a breach and cannot be penalized. *See Rand v. CF Indus., Inc.*, 797 F. Supp. 643, 647 (N.D. Ill. 1992) (discussing client's exercise of contractual right to discharge attorney) (citing *Rhoads v. Norfolk W. Ry. Co.*, 78 Ill.2d 217 (1979)). Accordingly, the University's cancellation of

one week of classes in response to a global pandemic and a mandatory stay-at-home order was not a breach of its contract with students. *See, e.g.*, *Miller*, 533 F. Supp. 3d at 686-87; *Buschauer*, 2021 U.S. Dist. LEXIS 67157 at *5, *15-16; *Gociman*, 515 F. Supp. 3d at 868; *Polley*, 2021 U.S. Dist. LEXIS 175822 at *24-25; *Chong*, 2021 U.S. Dist. LEXIS 89597 at *13-14.

### 2. The University Did Not Breach Any Contract Terms Regarding Activity Fees.

Plaintiff alleges that the University ceased offering activities and resources to students following the transition to remote learning. This assertion is inaccurate and unsupported by the record. The University continued to provide not only academic instruction but also activities, events, and resources for students to access virtually. SUMF at ¶ 23. Plaintiff himself acknowledges he continued to attend meetings for his student organization. SUMF at ¶ 34. Plaintiff's decision not to participate in or utilize remote events or resources does not convert the University's actions into a breach.

Moreover, there is no evidence to support Plaintiff's allegation that the University "profited off of closing campus . . . because it held no on-campus activities, events, or student organization events." SAC at ¶ 58. The SABRC Articles, which govern how activity fees are to be distributed, expressly contemplate and provide for circumstances in which certain fees are not fully exhausted at the end of a particular semester, calling for SERF funds to roll over to the next semester—not to be paid out to the University as "profit" from undisbursed activity fees. SUMF at ¶¶ 12-13. Plaintiff thus continued to benefit from certain unused portions of his Spring 2020 activity fee payments well after that semester ended, as he remained enrolled at the University for two more semesters. SUMF at ¶¶ 30-32.

### 3. The University Did Not Breach Any Contract Terms Regarding Course Surcharge Fees.

Plaintiff insists the University failed to properly utilize course surcharge fees—another

assertion that is similarly unsupported by the record. There is no specific contractual undertaking with respect to the exact use of course surcharge fees, but these fees have historically been used to cover equipment and software purchases, related maintenance, and technology needs. SUMF at ¶¶ 14-16. Plaintiff has offered no evidence that the course surcharge fees are specifically committed to, or have ever been used for, providing fifteen weeks of access to on-campus lab instruction, facilities, resources, or materials. Plaintiff also has not alleged and has offered no proof that the University failed to spend the course surcharge fees in accordance with their historic use. In fact, the University has shown the course surcharge fees were expended for their normal use, and per the University's standard practice, course surcharge fees are not required to be exhausted during the semester in which they were charged. SUMF at ¶¶ 16, 23.

### C.     Plaintiff Cannot Prove Damages for the Alleged Breach of Contract.

Plaintiff alleges he and the putative class members have been damaged by not having received the "full value of services paid," losing the "benefit of their bargain," and/or suffering "out-of-pocket losses" in exchange for tuition, activity fee, and course surcharge fee payments. SAC at ¶¶ 4, 78, 101, 103. Plaintiff proposes the measure of damages is the "difference in value between what they contracted for and what they received." SAC at ¶¶ 105-07. Plaintiff has failed to prove his allegations of damages for any of his theories.

"The basic theory of damages in a breach of contract action requires that a plaintiff 'establish an actual loss or measurable damages resulting from the breach in order to recover.'" *Aucar v. Carle Health Care Inc.*, 2017 IL App (4th) 160443-U, ¶ 15 (quoting *In re Ill. Bell Tel. Link-Up II*, 2013 IL App (1st) 113349, ¶ 19; *Avery v. State Farm Mutual Auto. Ins. Co.*, 216 Ill. 2d 100, 149 (2005)) (internal quotations omitted). "With a breach of contract action, the proper measure of damages is 'the amount of money necessary to place the plaintiff in a position as if the contract had been performed.'" *Id*. (quoting *Ill. Bell Tel.*, 2013 IL App (1st) 113349 at ¶ 19). A

26

damages award "should not place the plaintiff in a better position, resulting in a windfall to the plaintiff." *Id.* (citing *Ill. Bell Tel.*, 2013 IL App (1st) 113349 at ¶ 19). Moreover, "'[a] plaintiff must prove damages to a reasonable degree of certainty, and evidence cannot be remote, speculative, or uncertain.'" *Id.* (quoting *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 383 (1st Dist. 2004)). Damages "'are an essential element of a breach of contract action.'" *Id.* (quoting *Ill. Bell Tel.*, 2013 IL App (1st) 113349 at ¶ 19).

Here, Plaintiff has not presented and cannot present any evidence of loss of value, deprivation of the benefit of his bargain, or out-of-pocket losses as a result of his payment of tuition, activity fee, and course surcharge fees.

### 1. Plaintiff Has No Tuition Damages.

Plaintiff's assertion that he deserves to be reimbursed for one week of cancelled classes is tied to the unsupported idea that there is a *pro rata* correlation between tuition paid and instruction hours received each semester. Plaintiff has offered no evidence to support this view, much less to a reasonable degree of certainty, and indeed his own testimony directly contradicts his damages theory.

Plaintiff admits the value he received from continuing his classes in Spring 2020 was tied to accruing the necessary college credits to graduate and avoided a gap in his education that he believed would impact his ability to get into medical school. SUMF at ¶¶ 30-32. It was for this exact reason that Plaintiff continued to enroll at the University for the two semesters following Spring 2020 at the same tuition rate, despite knowing multiple classes would be remote and classes remained subject to COVID-related cancellation. SUMF at ¶¶ 30-32. It is undisputed that the University's cancellation of one week of classes did not affect Plaintiff's ability to receive college credit, and indeed preserved Plaintiff's ability to continue his education uninterrupted. SUMF at

¶¶ 20, 23. Plaintiff's damages theory ignores the fact that he received the exact value for which he bargained—college credit and a continuing education. His attempt to replace the actual value received with a remote, speculative, and uncertain theory that the value of a college education is measured by minutes in a classroom is unsustainable as a matter of law. *See Aucar*, 2017 IL App (4th) 160443 at ¶ 15.

Plaintiff's *pro rata* theory of tuition damages is further contradicted by his admission that professors have discretion to cancel classes, and he had multiple classes canceled outside of the one-week spring break adjustment—including one class that canceled a week's worth of instruction; yet, he is not seeking or otherwise claiming any entitlement to a *pro rata* reimbursement for these class cancellations. SUMF at ¶¶ 8, 21, 33. If the value of Plaintiff's tuition were measured temporally, then Plaintiff received *more* value for his Spring 2020 tuition than he did in the previous semester by sitting for approximately thirty more hours of instruction time during the Spring 2020 semester than the Fall 2019 semester for the same number of credit hours (and at the same tuition rate), even after accounting for the adjusted schedule. SUMF at ¶¶ 27-29. Consequently, Plaintiff has not established that he was damaged in any way by missing one week of classes.

### 2.      Plaintiff Has No Activity Fee Damages.

As for the activity fee, Plaintiff's damages theory rests on an erroneous allegation, made on "information and belief," that the University pocketed any unused activity fees at the conclusion of the Spring 2020 semester as "profit," thereby entitling Plaintiff and putative class members to the difference between what they paid and what they received. SAC at ¶¶ 58-59. Discovery has disproven Plaintiff's "information and belief" allegations. First, there is no factual basis to suggest the University was required to exhaust all activity fee payments in the semester in which they were

paid. Second, the University continued to offer activities and resources to students after the transition to remote learning, of which Plaintiff was informed. And third, certain unspent activity fees at the end of the semester rolled over to later semesters for the continued benefit of students (including Plaintiff). SUMF at ¶¶ 12, 36. The fact that Plaintiff chose not to attend other events outside of his regular AED meetings does not amount to damages.

### 3.    Plaintiff Has No Course Surcharge Fee Damages.

Plaintiff speculated, without any factual basis, that he would have received the majority of the course surcharge fee value after the transition to remote learning. SUMF at ¶ 40. As such, he believes he is owed 60-70% of his course surcharge fees, despite having access to campus for about 50% of the Spring 2020 semester and continuing to attend labs remotely after the transition to remote learning. SUMF at ¶ 40. Plaintiff's asserted damages are purely speculative. The University continued to spend the course surcharge fees as it always has. SUMF at ¶ 23. And Plaintiff has presented no evidence that the course surcharge fees were allocated for his personal enrichment or that most of the course surcharge fee value would have been expended on him later in the semester. Damages based on speculation are not recoverable. *See Waukegan Park Dist. v. First Nat'l Bank*, 22 Ill. 2d 238, 246 (1961); *Priddle v. Malanis*, Nos. 12-cv-5831, 12-cv-5833, 2016 U.S. Dist. LEXIS 4904, 11 (N.D. Ill. Jan. 12, 2016). Course surcharge fees are not spent on individual student *access* to on-campus lab instruction. Because Plaintiff's fees were spent in a manner consistent with University policy and practice, and *not* contrary to any contractual obligation, Plaintiff has not been damaged.

## III.    Plaintiff Cannot Prove an Unjust Enrichment Claim on Any Basis.

As an alternative to his breach of contract theory, Plaintiff also alleges that the University was unjustly enriched by its decision not to issue tuition, activity fee, and course surcharge fee refunds. SAC at ¶¶ 109-20. This claim also fails as a matter of law.

### A.  Plaintiff's Contractual Relationship with the University Precludes His Unjust Enrichment Claim.

A plaintiff may only plead an unjust enrichment claim as an alternative to a breach of contract claim if a dispute exists with respect to whether the parties' relationship is governed by contract. *See Miller*, 533 F. Supp. 3d at 687 (citations omitted). Where, as here, Plaintiff alleges the existence of a contract and the University does not dispute that a contract exists, an unjust enrichment claim is improper. *Id.* (dismissing student's unjust enrichment claim where university admitted to existence of contract). In this case, there is no dispute that a contract exists between Plaintiff and the University. Both parties agree the relationship is contractual. *See DiPerna*, 893 F.3d at 1007; *Ross*, 957 F.2d at 416. The only dispute is over the terms of that contract and the alleged breach—a key distinction that defeats Plaintiff's unjust enrichment claim. *Oyoque*, 520 F. Supp. 3d at 1065-66; *see also Hernandez v. Ill. Inst. of Tech.*, No. 20-CV-3010, 2021 U.S. Dist. LEXIS 78943, *16-18 (N.D. Ill. Apr. 23, 2021) (dismissing student's unjust enrichment claim where contract existed).

### B.  Unjust Enrichment Is Not an Independent Cause of Action in Illinois.

Moreover, under Illinois law, unjust enrichment is not an independent cause of action. *See, e.g.*, *Martis v. Grinnell Mut. Reins. Co.*, 388 Ill. App. 3d 1017, 1025 (3d Dist. 2009); *see also Rustom v. Naser Rustom & N. Star Trust Co.*, No. 17 C 9061, 2019 U.S. Dist. LEXIS 144936, *21 (N.D. Ill. Aug. 27, 2019) (adopting *Martis* and dismissing unjust enrichment claim). It requires "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence." *Id.* Because unjust enrichment claims are not independent causes of action, they must rise or fall with other claims predicated on the same misconduct. *See, e.g.*, *Lewis v. Lead Indus. Ass'n*, 342 Ill. App. 3d 95, 105-06 (1st Dist. 2003) (citations omitted). Here, Plaintiff's unjust enrichment claim is based on the same facts and circumstances as his breach of contract claim. *See* SAC at ¶¶ 109-

20. Plaintiff neither pleads nor has any evidence to suggest unlawful or improper conduct separate from the alleged breach of contract.[7] Accordingly, Count II cannot stand.

### C.     Plaintiff Cannot Prove an Unjust Enrichment Claim.

The University did not benefit from the transition to remote learning. To prove an unjust enrichment theory, Plaintiff must show that the University received a benefit to Plaintiff's detriment, and allowing the University to retain that benefit would be unjust. *Macon Cty. v. Merscorp, Inc.*, 968 F. Supp. 2d 959, 965-66 (C.D. Ill. 2013) (citation omitted). Plaintiff makes sweeping allegations that the University's receipt of CARES Act funding during the pandemic resulted in a windfall for the University. *See* SAC at ¶¶ 18-21, 116-119. But the record confirms the contrary: the University did not benefit during the Spring 2020 semester, whether from tuition, fees, or federal funding. In fact, it suffered a material financial toll.

The University used every penny of CARES Act funding for students, either by way of housing and meal plan refunds or through student aid grants. SUMF at ¶ 24. As a result, the University personally shouldered the financial burdens associated with the transition to remote learning, including continuing payroll for student and regular employees who could no longer perform their jobs due to the campus closure, as well as expenses for technology and supplies (like laptops for students) to facilitate the transition. SUMF at ¶ 25. To underscore the point, despite the transition to remote learning, the University continued to offer its students educational instruction,

---

[7] Plaintiff does add one allegation in the unjust enrichment count that Plaintiff "paid a $120 Health Fee, but could not access the service because [he was] required to move off campus and back home," denying him "access to the $120 Health Fee." SAC at ¶ 115. Plaintiff does not appear to seek relief for the health fee. *See* SAC at SAC at ¶ 81 (outlining putative classes Plaintiff seeks to represent, omitting health fee). To the extent Plaintiff maintains he should recover for the health fee, Plaintiff admits the University kept its Health Services Center open "during the entire Spring 2020 semester." SAC at ¶ 115. He further testified that he never sought medical assistance at the Health Services Center at any time during all his semesters at the University and that there was never a time where he would have sought medical assistance but was not able to do so. Ex. 1, Eddlemon Dep. at 53:8-18.

activities, and resources. SUMF at ¶ 23. At bottom, Plaintiff can point to no evidence that the University received an unjust benefit by closing campus to protect the University community. Consequently, Plaintiff's unjust enrichment claim fails.

## CONCLUSION

Plaintiff cannot prove either of his two claims. On his breach of contract count, no evidence establishes the alleged terms Plaintiff claims were breached. Plaintiff's expectations regarding how the Spring 2020 semester would be conducted cannot replace the plain language of the documents on which Plaintiff relies to form the contract. In any event, the University continued to provide educational services and resources, establishing that no breach occurred and that Plaintiff suffered no damages. Moreover, Plaintiff cannot succeed on his unjust enrichment count because a contract governs this dispute, and he has neither pled nor can he prove any other facts unrelated to his breach of contract claim to support unjust enrichment. Regardless, the evidence establishes that Plaintiff cannot prove the University unjustly benefited.

For the foregoing reasons, the University respectfully requests this Court grant the University's Motion for Summary Judgment, enter judgment for the University on both Counts I and II, and grant any other relief this Court deems equitable and just.

Dated: April 12, 2022                    Respectfully submitted,

                                         **BRADLEY UNIVERSITY**

                                         By:  /s/ *Gregory E. Ostfeld*
                                         Gregory E. Ostfeld (Attorney No. 6257163)
                                         ostfeldg@gtlaw.com
                                         Tiffany S. Fordyce (Attorney No. 235063)
                                         fordycet@gtlaw.com
                                         Kara E. Angeletti (Attorney No. 6329388)
                                         angelettik@gtlaw.com
                                         Greenberg Traurig, LLP
                                         77 West Wacker Drive, Suite 3100
                                         Chicago, Illinois 60601
                                         Tel: (312) 456-8400

                                         *Attorneys for Bradley University*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Kara E. Angeletti, certify that this brief complies with the type-volume limits of Central District of Illinois Local Rules 7.1(B)(4) and 7.1(D)(5) because the Argument section of this Motion consists of 19 pages with 6,033 words, including all headings, footnotes, and quotations, according to the word processing system used to prepare this Motion.


*/s/ Kara E. Angeletti*
Kara E. Angeletti

## <u>CERTIFICATE OF SERVICE</u>

I, Kara E. Angeletti, certify that on April 12, 2022, a true and correct copy of the **Defendant Bradley University's Motion for Summary Judgment** was served electronically through the Central District of Illinois CM/ECF electronic filing, and via electronic mail for all exhibits filed under seal, on all counsel of record.

_/s/  Kara E. Angeletti_____

One of Defendant's Attorneys